## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ADAM J. SCHRADER, | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. 4:11-CV-00902 |
| | : | |
| vs. | : | (Complaint Filed 5/12/11) |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| COMMISSIONER OF SOCIAL | : | (Judge Caputo) |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Adam J. Schrader's claim for social security disability insurance benefits.

On December 8, 2008, Schrader filed protectively[1] an application for disability insurance benefits. Tr. 12, 64 and 140.[2]  The application was initially denied by the Bureau of Disability Determination[3] on March 13, 2009. Tr. 12 and 73-76.  On May 12, 2009, Schrader requested a hearing before an administrative law judge. Tr. 12, 77-78 and 151-158.

---

[1]Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[2]References to "Tr._" are to pages of the administrative record filed by the Defendant as part of his Answer on July 18,  2011.

[3]The Bureau of Disability Determination is a state agency which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 73.

After 10 months had elapsed, a hearing was held on March 25, 2010. Tr. 12 and 24-60.  On May 13, 2010, the administrative law judge issued a decision denying Schrader's application. Tr. 12-19.  On May 26, 2010, Schrader filed a request for review with the Appeals Council and on March 11, 2011, the Appeals Council concluded that there was no basis upon which to grant Schrader's request. Tr. 1-5 and 8.

Schrader then filed a complaint in this court on May 12, 2011.  Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on November 1, 2011,  when Schrader filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Schrader met the insured status requirements of the Social Security Act through December 31, 2010. Tr. 12, 14 and 140.

Schrader, who was born in the United States on January 12, 1972,[5] graduated from high school in 1996[6] and can read, write, speak and understand the English language

_____

[4]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

[5]At the time of the administrative hearing and the administrative law judge's decision, Schrader was 38 years of age and considered a "younger individual" whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. § 404.1563(c). The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

[6]Schrader withdrew from high school when he commenced using illegal substances in the 11th grade.  Tr. 253.  He went back to school at age 25 and obtained his high school

and perform basic mathematical functions. Tr.  64, 176, 189, 194, 200 and 253-254.  During

Schrader's elementary and secondary schooling, he attended regular education classes. Tr.

204.   Schrader reported that he was an average student. Tr. 253.

Schrader has past relevant employment[7] as a delivery person, packager and

industrial cleaner. Tr. 17 and 49.  Those positions were described by a vocational expert as

medium work. Id. [8]  Records of the Social Security Administration reveal that Schrader had

_____

diploma. Id.

[7]Past relevant employment in the present case means work performed by Schrader during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

[8]The terms sedentary, light and medium work are defined in the regulations of the Social Security Administration as follows:

(a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as  loss of fine dexterity or inability to sit for long periods of time.

earnings spanning the  years 1988 through 2007 as follows;

| | |
|---|---|
| 1988 | $ 2356.25 |
| 1989 | 3040.00 |
| 1990 | 5774.01 |
| 1991 | 7637.36 |
| 1992 | 2395.50 |
| 1993 | 2100.90 |
| 1994 | 0.00 |
| 1995 | 2212.66 |
| 1996 | 7920.00 |
| 1997 | 2640.00 |
| 1998 | 0.00 |
| 1999 | 4933.75 |
| 2000 | 16646.00 |
| 2001 | 18694.00 |
| 2002 | 19722.38 |
| 2003 | 18505.00 |
| 2004 | 5292.00 |
| 2005 | 0.00 |
| 2006 | 6007.77 |
| 2007 | 620.00 |

Tr. 124.  Schrader's total earnings during those years were $113,463.97. Id.

Schrader has a significant history of using illegal drugs (cocaine and marijuana) and criminal behavior, including convictions for forgery and assault. Tr. 30-34, 45  and 252-254.   He has been incarcerated for extended periods of times in both the Dauphin and Perry County Prisons.  Id.  In 2005 Schrader was convicted of a forgery charge and received a sentence of imprisonment of one to three years  in the Perry County Prison.

---

(c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

20 C.F.R. § 404.1567.

4

Tr. 44-45.  Schrader was incarcerated in 2006 apparently for drug offenses but granted work-release. Tr. 30-34.   While on work-release he "threatened to beat the crap out of" his employer and the work-release was revoked.  Id.   In 2007 Schrader was convicted of assaulting his wife and was sentenced to 10 months in the Dauphin County Prison to be followed by "5 years of probation or parole." Tr. 42.  Schrader last worked on May 30, 2007, when his work-release from prison was again revoked this time allegedly for being in possession of cell phone. Tr. 44-45 and 190.

Schrader alleges that he became disabled on July 30, 2004,[9] because of the following mental health impairments: bipolar disorder, antisocial personality disorder, attention deficit hyperactivity disorder and depressive disorder.   Doc. 15, Plaintiff's Brief, p. 2.   In the present appeal Schrader does not contend that he is disabled because of a physical impairment.  Id.   Schrader testified that he last worked on a consistent basis in 2004 as a delivery person. Tr. 37-38.   The reason given by Schrader for terminating that employment was that he became "hooked on crack cocaine and [his] boss basically asked [him] to quit or resign or she was going to fire [him]." Tr. 38.   The record further reveals several instances where Schrader while incarcerated engaged in manipulative behavior to obtain drugs.  Tr.  303 and 306.

---

[9]Mr. Schrader also applied for disability insurance benefits and supplemental security income benefits on August 31, 2007, alleging an inability to work since July 30, 2004.  That claim was denied at initial review by the Bureau of Disability Determination. There is no indication that Schrader appealed that denial. In the present case the ALJ did not address the prior claim but merely indicated and *sub silentio* accepted that Schrader's alleged disability onset date was July 30, 2004. Tr. 12 and 19.  Our review of the administrative record did not reveal the actual current or prior applications for benefits filed by Schrader. From other documents in the record we were able to discern when they were filed and what they alleged.

For the reasons set forth below we will affirm the decision of the Commissioner denying Schrader disability insurance benefits.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin.,  181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.");  Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360

(3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

[a]n individual shall be determined to be under a

> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance claims.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[10] (2) has an impairment that is severe or a combination of impairments that is severe,[11] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[12] (4) has the residual functional capacity to return to his

---

[10]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

[11] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g).  Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

[12]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an

or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[13]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## MEDICAL RECORDS

Because Schrader only alleges mental health impairments in the present appeal, we will only address the records which address Schrader's mental health status.

In medical history forms dated February 21 and April 18, 2006, from Perry County Prison there were no psychiatric disorders noted. Tr. 245-246.

---

impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

[13]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

While incarcerated in the Perry County Prison, Schrader on August 25, 2006 reported that he had a history of cocaine and crack use; he was not taking any psychiatric medications; he never tried to commit suicide; he did not feel suicidal; he was never hospitalized or treated by a psychiatrist or mental health counselor; and he did not feel he needed to see a psychologist or psychiatrist. Tr. 243-244.  In a physical examination form dated September 3, 2006, by a physician's assistant, and September 5, 2006 by a physician, there were no psychiatric problems noted. Tr.  242.

On or about November 21, 2007, Schrader was examined by Louis Laguna, Ph.D., a psychologist, on behalf of the Bureau of Disability Determination. Tr. 252-257. Schrader drove himself to the examination and arrived on time, casually dressed with good hygiene.  In his report of this examination Dr. Laguna set forth the following background information:

> The claimant is a 35-year-old, separated, white male who is currently not working.  He said that the last job he had was back in May 2007, working at a masonry company.  The claimant said that he was on work release at the time from the Perry County Prison.  The claimant said that the job lasted for only eight days before work release revoked.  I asked the claimant why his work release was revoked and he stated, "The person decided to kick me off work release. They just didn't like me."  The claimant said the longest job he ever had was from 1999 to 2003.  He said he worked for a food delivery company at the time . . .He said that he left after he was caught by his boss smoking crack cocaine.  He said that he was given the option of either resigning of going into rehab. The claimant said that he refused to go into rehab and consequently resigned. . . . Mannerism were noteworthy for an extreme "chip on his shoulder." He was quite guarded and answered most of the questions with a sarcastic attitude.  For example, I brought the claimant into the appointment about ten minutes after the hour at which point he told me that I was lucky that I informed him before hand that I was running a few minutes late because if I had not, he would have challenged me about why I kept him waiting for ten minutes.

Tr. 252-253.  Schrader told Dr. Laguna that he had just been released from prison 3 months

10

prior to the interview, after serving a sentence of 19 months. Tr. 253.  Schrader stated that

he applied for disability because he needed help with a cocaine addictions, but he had not

used drugs for the past 22 months. Tr. 254.  Schrader further stated that he could not get

a job because of his criminal history. Id.  Schrader denied any psychiatric hospitalizations

and stated he was taking no medications. Tr. 253.  Schrader admitted that when he uses

drugs he becomes angry and aggressive and that he has been in and out of prison at least

ten times. Tr. 254.  Schrader told Dr. Laguna that "he is an avid sports fan and spends most

of his days watching television." Id.  He further told Dr. Laguna that he is able to cook, clean,

shop and take care of his own personal care, health and hygiene.  Tr. 255.

Dr. Laguna's mental status examination of Schrader revealed that Schrader

had average self-esteem; his speech was normal and his mood indifferent; he denied

symptoms of depression; he reported episodes of anger and frustration; he denied

hallucinations or delusions; his thought processes, productivity, continuity and language were

all intact; he was able to think abstractly as evidenced by the ability to interpret simple

proverbs, like "You can't judge a book by its cover;" he had the ability to calculate serial

threes and his general knowledge was good; his recent, recent past, and remote memory

were all intact but his insight and judgment were poor. Tr. 254-255.

Dr. Laguna's impression was that Schrader suffered from polysubstance

dependence, early full remission and  antisocial personality disorder. Tr. 255. Dr. Laguna

gave Schrader a Global Assessment of Functioning (GAF) score of 55, which indicates

moderate symptoms.[14]  Dr. Laguna completed a medical source statement of Schrader's

---

[14]The GAF score allows a clinician to indicate his judgment of a person's overall
psychological, social and occupational functioning, in order to assess the person's mental

work-related mental abilities. Tr. 256-257.   In that statement Dr. Laguna indicated that

Schrader had no impairment in his ability to understand, remember and carry out instructions

or in his ability to respond appropriately to supervision, co-workers, and work pressures in

a work setting.  Id.

On November 30, 2007, a treatment plan was prepared for Schrader by  T.W.

Ponessa & Associates Counseling Services. Tr. 350-352.  In that plan which was signed by

a psychiatrist on December 5, 2007, it was noted that Schrader's current GAF score was 65.

Tr. 350.   A similar document was prepared by T.W. Ponessa & Associates Counseling

Services on or about February 19, 2008, indicating that Schrader's current GAF score was

65.  Tr. 347-349

On December 4, 2007, Michael Suminski, Ph.D., a psychologist, reviewed

Schrader's  medical  records  on  behalf  of  the  Bureau  of  Disability  Determination  and

---

health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed. 1994). A
GAF score is set within a particular range if either the symptom severity or the level of
functioning falls within that range. Id. The score is useful in planning treatment and
predicting outcomes. Id.  The GAF rating is the single value that best reflects the
individual's overall functioning at the time of examination.  The rating, however, has two
components: (1) symptom severity and (2) social and occupational functioning.  The GAF
is within a particular range if either the symptom severity or the social and occupational
level of functioning falls within that range.  When the individual's symptom severity and
functioning level are discordant, the GAF rating reflects the worse of the two.  Thus, a
suicidal patient who is gainfully employed would have a GAF rating below 20.  A GAF score
of 21-30 represents behavior considerably influenced by delusions or hallucinations or
serious impairment in communication or judgment or inability to function in almost all
areas.  A GAF score of 31-40 represents some impairment in reality testing or
communication or major impairment in several areas,  such as work or school, family
relations, judgment, thinking or mood. Id.  A GAF score of 41-50 indicates serious
symptoms or any serious impairment in social, occupational or school functioning.  Id.  A
GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social,
occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild
symptoms or some difficulty in social, occupational, or school functioning, but generally
functioning pretty well with some meaningful interpersonal relationships. Id.

concluded that Schrader suffered from a non-severe personality disorder and substance addiction disorder. Tr. 258-270.   Dr. Suminski found that Schrader had no functional limitations with respect to activities of daily living and maintaining concentration, persistence or pace; and only moderate limitations with respect to social functioning. Tr. 268.   Dr. Suminski further stated in toto as follows: "The claimant alleges disability due to Bipolar Disorder, depression, drug addiction, and anger problems.   The medical evidence of record was carefully reviewed.   It indicated that the claimant had no history for treatment of Bipolar Disorder. Prison records indicate that he has a history of crack cocaine dependence.   He spent 19 months in prison and was released with 19 months of sobriety. The claimant had a psychological [consultative examination] on 11/21/07 [by Dr. Laguna] which indicated that the claimant alleges the he had maintained abstinence from drugs.   The diagnoses that [Dr. Laguna] assigned are Anti-social Personality Disorder and Polysubstance Dependence in remission.   The claimant is not in treatment for mental illness.   His [activities of daily living] show only impaired social functioning which is of course associated with his personality disorder.   There is no indication that the claimant is currently disabled by mental illness. Based on the evidence of record, the claimant' statements are found not to be credible." Tr. 270.

A prison medical record from Dauphin County Prison dated January 4, 2008, indicates that Schrader denied suicidal impulses and auditory or visual hallucinations. Tr. 303 and 323.   It further noted that Schrader complained of situational depression and "appears drug seeking" and "insistent on receiving meds." Id.   The diagnosis was polysubstance abuse  (cocaine, alcohol and marijuana), antisocial personality disorder and "malingering to obtain meds." Id.   The primary prison psychiatrist treating Schrader  was

Enos D. Martin, M.D.

A prison psychiatric note from February 5, 2008, indicates that Schrader had "mild irritability" and was "not suicidal" and "not psychotic." Tr. 302 and 322. He was described as suffering from a mood disorder, not otherwise specified, and attention deficit disorder. Id. He was prescribed Depakote and Imipramine.[15] Id.

A prison psychiatric note dated February 27, 2008, reveals that Schrader was doing well and euthymic.[16] Tr. 321.

A prison psychiatric note dated April 10, 2008, states that Schrader had several psychosocial stressors, including marital and family issues and legal problems. Tr. 320. The assessment was that he suffered from situational anxiety and mood instability. Id.

A prison psychiatric note dated April 21, 2008, reveals that Schrader was complaining of "tremors with Depakote" but that he was euthymic and stable. Tr. 319.

A prison psychiatric note dated May 6, 2008, indicates that Schrader was mildly subdued, not suicidal and relatively stable. Tr. 318.

A prison psychiatric note dated May 21, 2008, indicates that Schrader was relatively stable. Tr. 317. On June 4, 2008, Schrader was reported to be euthymic and

---

[15]Depakote (Valproic Acid) "is used alone or with other medications to treat certain types of seizures. Valproic acid is also used to treat mania (episodes of frenzied, abnormally excited mood) in people with bipolar disorder[.]" Valproic Acid, AHFS Consumer Medication Information, U.S. National Library of Medicine, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000677/ (Last accessed September 21, 2012). Imipramine is used to treat depression. Imipramine, Drugs.com, http://www.drugs.com/mtm/imipramine.html (Last accessed September 21, 2012).

[16]Euthymic is defined as "pertaining to a normal mood in which the range of emotions is neither depressed nor highly elevated." Mosby's Medical Dictionary, 8th edition, 2009. http://medical-dictionary.thefreedictionary.com/euthymic (Last accessed September 21, 2012).

stable. Id.

A prison psychiatric note dated June 24, 2008, indicates that Schrader had increased situation stress from an upcoming court date in July. Tr. 316.

On July 21, 2008, Schrader was seen by prison psychiatrist Martin after a correctional officer reported that Schrader was "acting crazy." Tr. 315. Schrader denied suicidal or homicidal impulses but complained of auditory and visual hallucinations but "nothing major." Id. The diagnosis was antisocial personality disorder and "polysubstance dependence in remission in a controlled environment." Id. The psychiatric notes from this date further indicate that Schrader was "[complaining of] frustration about not going home" and stating that "he has 6 kids." Id.

A prison psychiatric note from July 22, 2008, indicates that Schrader was suffering from mild anxiety but he was coherent and not psychotic. Tr. 314.

A prison psychiatric note from July 24, 2008, reveals that Schrader was suffering from an acute episode of psychotic thinking but he was not suicidal. Tr. 313. However, the next day as indicated by a psychiatric note he had "no complaints" and was feel[ing] better." Id. The objective portion of the note states that Schrader was "subdued just awoke" and the assessment was that Schrader was "improving" but "still unstable." Id.

A prison psychiatric note from July 29, 2008, indicates that Schrader was euthymic and subdued with no hallucination or delusions. Tr. 312. The impression was that he suffered from a mood disorder, not otherwise specified. Id.

A prison psychiatric note from August 5, 2008, indicates that Schrader was doing well and felt stable but was not sleeping well. Id. The objective portion of the note states that Schrader was euthymic and the assessment was "improved & stable." Id.

15

A prison psychiatric note from August 19, 2008, states that Schrader was doing well but he felt that the Sinequan was "not helpful."[17] Tr. 311.  The objective portion of the note indicates that Schrader was euthymic and the assessment was "relatively stable." Id.

A prison psychiatric note from September 5, 2008, states that Schrader was doing well but having a "tremor from Depakote" and "mouth numb from Sinequan." Tr. 311.  The objective portion of the note states that Schrader was euthymic and subdued. Id.  The assessment was "relatively stable." Id.

A prison psychiatric note from September 18, 2008, indicates that Schrader was "doing well but still has tremor" and "euthymic." Tr. 310.   A prison psychiatric noted dated September 23, 2008, indicates that Schrader was complaining of a tremor (apparently a side effect of the Depakote) depression and mood swings. Id. The objective portion of the note, however, indicates that Schrader was euthymic.  Id.   The treating medical provider discontinued the  Depakote prescription. Id.

A medical record dated October 2, 2008, from Dauphin County Prison stated that Schrader "appears very manipulative and drug seeking." Tr.  309.  He was diagnosed as suffering from antisocial personality disorder and polysubstance dependence and it was stated that he was "feigning hallucinations to obtain psych meds." Id.

Three months after being released from prison in October, 2008, Schrader was examined by Rahat Taswir, M.D., a psychiatrist, in Harrisburg, Pennsylvania. Tr. 324-326.  Schrader was casually dressed and came from work with faint stains on his clothing. Tr. 325.  He was taking the antidepressant Celexa and reported a history of mood swings, racing

---

[17]Sinequan is used to treat anxiety and depression. Sinequan, Drugs.com, http://www.drugs.com/cdi/sinequan.html (Last accessed September 21, 2012).

thoughts, poor impulse control, aggressive behaviors, and episodes of anger and depression. Id.   Schrader also reported having difficulty following orders stating that it was the reason he was self-employed. Id.  He told Dr. Taswir he had six children ages 16, 14,12, 11, 9 and 8 and that he lived with them and his wife. Id.   Dr. Taswir's mental status examination of Schrader revealed that Schrader was not very expressive, with a decreased tone of voice and a flat mood. Id.  Schrader seemed to have adequate insight, but limited judgment by history. Tr. 325-326.   Schrader had no suicidal or homicidal thoughts and no psychotic symptoms. Tr. 326.  Schrader was alert and oriented and with fair cognition and mentation. Id. Dr. Taswir's impression was that Schrader suffered from bipolar disorder, not otherwise specified, and personality disorder, not otherwise specified.   Id.   He gave Schrader a GAF score of 50 and prescribed the medication Risperdal. Id.

A Mental Health Closing Summary prepared by "Case Management Unit Charting Paths Creating Opportunity"[18]  on March 6, 2009, indicates that they provided care for Schrader from August of 2008 up to sometime in December 2008 and that his GAF score during that time was 65. Tr. 355.  This same mental health provider indicated that in November 2007 and June, 2008,  Schrader's GAF score was 55.  Tr. 370 and 381-382.

Based upon a review of the medical evidence of record in March, 2009, Mark Hite, Ed.D., a state agency psychologist, concluded that Schrader's suffered from Bipolar Disorder, not otherwise specified, Antisocial Personality Disorder and Polysubstance Dependence but that those conditions did not meet or medically equal any of the mental health listings. Tr. 327-342. Dr. Hite opined that Schrader was "not significantly limited" in

---

[18]The "Case Management Unit" appears to be a non-profit mental health organization in Dauphin County. Tr. 368 and 383.

most areas of mental work functioning and had only "moderate" limitations in (1) understanding, remembering, and carrying out detailed instructions and (2) accepting instructions and responding appropriately to criticism from supervisors. Id.

Dr. Hite stated that Dr. Taswir's January 2009 examination findings supported his opinion. Tr. 342.  Dr. Hite opined that Schrader's basic memory processes were intact and he could perform routine, repetitive work in a stable environment, make decisions, maintain attention and concentration for extended periods of time, and be expected to complete a normal workday without exacerbation of psychological symptoms. Id.  Dr. Hite indicated that Schrader was self-sufficient with no restrictions in adaptation.  Dr. Hite concluded that Schrader was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations from his impairments." Id.

In March 2009[19] Schrader had a 15-minute session with Dr. Taswir. Tr. 397. At that appointment Schrader stated that he thought his medication was working, but was "not strong enough" even though at "certain times [he] feels ok." Id.  Schrader reported that he experienced no episodes of physical aggression since his last visit. Id.   A mental status examination revealed that Schrader was "calmer" with no suicidal or homicidal ideations but was "not very descriptive." Id.  Schrader reported no medication side effects. Id.

At a 15-minute session with Dr. Taswir on June 15, 2009, Schrader reported "doing well," "feel[ing] better" and having a "stable" mood. Tr. 396. Notably, Schrader stated that he was "work[ing] as a handyman." Id.  He also stated that he gets depressed "once in a while." Id.  A mental status examination revealed that Schrader was not very expressive,

[19]The date appears to be March 4, 2009.  However, we cannot be certain because of Dr. Taswir's poor penmanship.

18

but had no suicidal or homicidal thoughts. Id.   Schrader stated that he suffered fatigue as a medication side effect. Id.    Dr. Taswir adjusted Schrader's medications.[20] Id.

In September, 2009, Dr. Taswir had a 20-minute session with Schrader. Tr. 395.   Schrader reported that he was unemployed and that he applied for social security disability. Id.  A mental status examination revealed that Schrader had a flat mood but was without suicidal or homicidal thoughts or auditory or visual hallucinations. Id.  Schrader reported no medication side effects.  Id.  It appears that Dr. Taswir adjusted Schrader's medications. Id. The treatment notes of this session are only partly legible.

On November 17, 2009, Dr. Taswir had a session with Schrader at which Schrader reported that he "gets_____ of anger – not bad – waiting about Social Security – mood swings better – no jobs – lately depressed." Tr. 394.  A mental status examination revealed that Schrader had a "flat mood" but had no suicidal or homicidal thoughts. Id.  Schrader reported no medication side effects. Id.   Dr. Taswir adjusted Schrader's medications. Id.

On January 11, 2010, Dr. Taswir had a session with Schrader. Tr. 393.  The notes of this session are almost completely illegible. It appears that Schrader reported a knee problem, that he was on the nonsteroidal anti-inflammatory drug naproxen, and that the knee pain caused him to lack focus and made his mood worse. He appears to have also reported that he was now on probation for 4 ½ years and that he applied for social security and his case was on appeal.  Id.  The mental status examination revealed no suicidal or homicidal thoughts and he had  "_____ mood." Id.  Schrader reported no medication side

---

[20]Dr. Taswir's notes are barely legible.

effects. Id.

On February 12, 2010, Dr. Taswir had a 15-minute session with Schrader. Tr. 392.  Schrader reported that there were times when he gets angry, but stated that he tried Ritalin "from a friend" and it "calmed him down." Id.   Schrader complained of decreased attention. Id.  Dr. Taswir's mental status findings were again brief and illegible consisting of two words (one which appears to be "mood") and a notation that Schrader had no suicidal or homicidal thoughts.  Id.  Schrader reported no medication side effects.  Id.

On  March 8, 2010, Dr. Taswir completed a form at that request of Schrader's attorney in which Dr. Taswir indicated that Schrader had "moderate" (meaning "has limitations often"),  "marked" (meaning "unable to function independently") and "extreme" (meaning "no useful ability") limitations in several  areas of mental work functioning. Tr. 389. Specifically, Dr. Taswir stated that Schrader had extreme limitations in his ability to deal with work stress, perform task/activities within a schedule, fulfill quota or production requirements, get along with co-workers and peers, and accept instructions/respond appropriately to criticism;  that Schrader had marked limitations in his ability to understand and remember detailed instructions, work with or near others without being distracted, complete a normal workday or workweek, and interact appropriately with the public; and that Schrader had moderate limitations in his ability to understand and remember short, simple instructions, maintain attention and concentration, and make simple work-related decisions. Id. However, Dr. Taswir stated that Schrader only had "mild" limitations (meaning "some limitations, but can function generally well on a sustained basis") in Schrader's ability to sustain an ordinary routine without special supervision and set realistic goals or make plans independently of others. Id.  Dr. Taswir when asked if Schrader's impairments existed and

persisted[21] with the restrictions noted above since July 30, 2004, answered as follows: "Don't know." (Emphasis added.)   Although Dr. Taswir indicated that he believed Schrader would be absent from work because of Schrader's impairments or treatment and that Schrader had "a residual disease process of at least 2 years duration" he did not indicate that the mental functional limitations that he assessed lasted or were expected to last  for "a continuous period of not less than 12 months."  Tr. 390.  Finally, Dr. Taswir indicated that Schrader could manage benefits in his own best interest. Id.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Schrader had not engaged in substantial gainful work activity since July 30, 2004, the alleged disability onset date. Tr. 14.  The administrative law judge found that the work performed by Schrader after the alleged onset date did not amount to substantial gainful activity. Id.

At step two of the sequential evaluation process, the administrative law judge found that Schrader had the following severe impairments: "back pain, attention deficit hyperactivity disorder, bipolar disorder NOS,[22]  anti-social personality disorder, and polysubstance abuse in full, sustained remission." Id.

---

[21]"Persist" is defined as "to continue to exist especially past a usual, expected, or normal time."  Synonyms are "carry on" and "persevere." Meriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/persist (Last accessed September 21, 2012).  "Continuous" is defined as "marked by uninterrupted extension in space, time or sequence." Id. http://www.merriam-webster.com/dictionary/continuous (Last accessed September 21, 2012).  It goes without saying that if something did not persist for a period of time, it could not have been continuous during that period of time.

[22]"NOS" is an abbreviation for "not otherwise specified."

At step three of the sequential evaluation process the administrative law judge found that Schrader's impairments did not individually or in combination meet or equal a listed impairment. Tr. 15.  In so finding the administrative law judge relied on the opinions of the state agency psychologist who found that Schrader's impairments did not meet or medically equal the criteria of any listed impairment. Id.  Furthermore, he correctly noted that "no treating or examining physician has either offered an opinion or reported findings of listing level severity." Id.

At step four of the sequential evaluation process the administrative law judge found that Schrader had the residual functional capacity to perform medium work as defined in the regulations

> except that the claimant must take hazard precautions by avoiding jobs which involve heights and moving machinery; the claimant is limited to simple, routine tasks and to goal-oriented rather than production paced tasks; the claimant must avoid interaction with the general public and have only occasional interaction with supervisors and co-workers; the claimant should primarily work alone; and the claimant requires a stable workplace with few if any changes in the setting, processes, and tools.

Tr. 15-16.  The administrative law judge further found based on this residual functional capacity and the testimony of vocational expert that Schrader could not perform his past relevant work as a delivery person, packager and industrial cleaner. Tr. 17.

In concluding that Schrader had the residual functional capacity to engage in the above-referenced limited range of unskilled, medium work, the administrative law judge relied on the opinions of Dr. Laguna, Dr. Suminski, and Dr. Hite and rejected the opinion of Dr. Taswir.   Tr. 15 and 17.  In rejecting Dr. Taswir's opinion the administrative law judge

stated in part as follows:

> The undersigned rejects the opinion of the treating psychiatrist . . .
> Dr. Taswir's assessment indicated several marked and extreme areas
> of functional limitations. However, in actual treating records there were
> minimal signs and findings to support such a finding.

Tr. 17.  The administrative law judge also referred in length to the opinions of Dr. Laguna and Dr. Hite in support of his rejection of Dr. Taswir's opinion.   The administrative law judge further found that Schrader's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent they were inconsistent with an ability to perform the a limited range of  unskilled, medium work  as described above.   In finding that Schrader was not a credible witness, the administrative law judge noted (1)  Schrader's statements while incarcerated that "he had no psychiatric disorder;" (2)  the evidence that Schrader "feigned hallucinations and engaged in drug-seeking behaviors," and (3) the fact that  Schrader was convicted of forgery, a crime of deception. Tr. 16.

At step five, the administrative law judge based on a residual functional capacity of a limited range of unskilled, medium  work  and the testimony of a vocational expert found that Schrader had the ability to perform unskilled, medium work as an automobile detailer and as a cleaner,[23]  and that there were a significant number of such jobs in the national and local economies. Tr.  18 and  52-53.

The administrative record in this case is 423 pages in length and we have

---

[23]The vocational expert testified that the automobile detailer's Dictionary of Occupational Titles (DOT) number was 915.687-34. Tr. 52-53.  The DOT describes that position as unskilled, medium work.  The DOT indicates that that position has a Special Vocational Preparation rating of 2.  Positions with an SVP rating of 1 or 2 are considered unskilled positions.  The cleaner's DOT number was 919.687-014 and is described as unskilled, medium work with an SVP rating of 1.

thoroughly reviewed that record.   The administrative law judge did an adequate job of reviewing Schrader's vocational history and medical records in his decision. Tr. 12-19. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 16, Brief of Defendant.

Schrader argues that the administrative law judge erred when (1) he rejected Dr. Taswir's opinion and accepted Dr. Laguna's opinion, and (2) when he failed to address in his decision a statement of Schrader's mother.   We find no merit in Schrader's first argument.  As for the second argument, although it was error for the administrative law judge not to address in his decision the statement by Schrader's mother, we find that it was harmless error.

The Social Security regulations require that an applicant for disability benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled."  20 C.F.R. §§ 404.1512(c) and 416.912(c).  Schrader  failed to provide such evidence.  No physician, psychologist or therapist  who treated Schrader indicated that Schrader was disabled for the requisite continuous 12 month period required by the statute.[24]  In contrast, the opinions of Dr. Laguna, Dr. Suminski and Dr. Hite clearly supports  the  administrative  law  judge's  determination  at  steps  three  and  four  of  the

---

[24]As stated earlier in this memorandum to receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

sequential evaluation process.

The medical opinion of a treating physician as to the nature and severity of an impairment is only entitled to controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the case. 20 C.F.R. § 404.1527(d).  In this case the administrative law judge adequately explained why he rejected the opinion of Dr. Taswir.    The administrative law judge appropriately relied on the opinions of Dr. Laguna, Dr. Suminski and Dr. Hite in finding that Schrader had the mental functional ability to engage in competitive work.    See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011) ("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").  The administrative law judge appropriately evaluated Schrader's mental impairments and took into account Schrader's mental functional limitations in the residual functional capacity assessment.

As stated above, the administrative law judge found that Schrader was not credible to the extent that he claimed that she could not engage in a limited range of unskilled, medium. The administrative law judge was not required to accept Schrader's subjective claims regarding his mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ."

Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed Schrader when he testified at the hearing on March 25, 2010, the administrative law judge is the one best suited to assess the credibility of Schrader.

As for the Schrader's claim that the case should be remanded because the administrative law judge did not address a written statement from Schrader's mother dated October 20, 2007, we do not see that the mother's statement buttresses Schrader's credibility or calls into question the administrative law judge's credibility analysis. In fact a statement on the form completed by the mother conflicts with a statement on a similar form completed by Schrader in 2007. Schrader on October 18, 2007, reported that "he did not take care of anyone else such as a wife/husband, children . . ." Schrader's mother, however, reported that Schrader took care of his children, including playing games with them and helping them with their homework. Tr. 174 and 182  The mother also reported that Schrader had no problem sleeping. Id.  However, Schrader reported that he did. Id.  The administrative law judge's credibility determination is amply supported by evidence drawing into question Schrader's credibility. The form completed in 2007 was specifically admitted into evidence by the administrative law judge and we are confident that he was aware of it, and even if he was not aware of it, we are also confident that remanding the case for him to consider it would not result in an award of benefits to Schrader. See Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir 1989)(noting that "no principle of administrative law or common sense requires [a court] to remand a case in quest of a perfect opinion unless there is reason

26

to believe that the remand might lead to a different result").    The failure to address specifically the statement of Schrader's mother in the decision in the context of assessing Schrader's credibility was harmless error at most under the circumstances of this case.  See Weary v. Astrue, Civil No. 10-896, slip op. at 40-41 (M.D.Pa. Dec. 15, 2010)(Muir, J.)(applying harmless error analysis); Boyd v. Astrue, Civil No. 11-600, slip op. at 25-26 & 28 (M.D. Pa. May 10, 2012)(Munley, J.).

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


/s/ A. Richard Caputo
A. RICHARD CAPUTO
United States District Judge


Dated: September 28, 2012